IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
IN ADMIRALTY

Case No. 05-14042-CIV-MOORE/LYNCH

OLD PARK INVESTMENTS, INC.,
d/b/a Harbortown Marina,

    Plaintiff/Counter-Defendants,[1]

vs.

**CLOSED CIVIL CASE**

The vessel "LEDA" (O/N 1106809), her boats,
tackles, apparel, furniture and furnishings,
equipment, engines and appurtenances in rem;
and MYRON E. BAILEY, BARBARA G.N. BAILEY,
ANCHOR CHARTERS, L.L.C. and NORTHERN
INSURANCE COMPANY OF NEW YORK,
in personam

    Defendants/Counter-Plaintiffs.[2]
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE came before the Court upon a non-jury trial on July 19-21, 2006, Counter-Defendant's Closing Argument and Incorporated Motion for the Entry of an Involuntary Dismissal and/or Judgment on Partial Findings (DE #177), and Counter-Plaintiff's Final Argument (DE #181).

UPON CONSIDERATION of the evidence presented, the post-trial filings of the parties,

---

[1] For ease of reference, as the only operative claims are with The vessel "LEDA" (O/N 1106809), her boats, tackles, apparel, furniture and furnishings, equipment, engines and appurtenances in rem; and MYRON E. BAILEY, BARBARA G.N. BAILEY, ANCHOR CHARTERS, L.L.C. and NORTHERN INSURANCE COMPANY OF NEW YORK, in personam as Counter-Plaintiffs and OLD PARK INVESTMENTS, INC. d/b/a Harbortown Marina as Counter-Defendant, the Counter-Plaintiffs will be referred to in these Findings of Fact and Conclusions of Law as the "Plaintiffs" and the Counter-Defendant as "Defendant."

[2] See supra note 1.

the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1.  ANCHOR CHARTERS, L.L.C, ("Anchor Charters") is a Delaware limited liability company formed in 2000 for the purpose of owning the S/Y Leda (the "Leda"). MYRON E. BAILEY and BARBARA G.N. BAILEY are members of Anchor Charters. See Am. Compl. ¶¶ 4-7.

2.  The Leda is a 56 foot aluminum-hull sailboat manufactured by Alubat. Def. Ex. 2.

3.  On or about November 21, 200, Anchor Charters purchased the Leda for $325,000.00 plus applicable tax. Tr. at 127. The Leda was listed for sale at $375,000.00. Def. Ex. 1.

4.  Prior to purchasing the Leda, Anchor Charters secured the services of Ed Rowe & Associates to conduct a pre-purchase condition and value survey of the Leda. Tr. at 122. This report indicated that the Leda had an approximate market value of $360,000.00 as equipped. Tr. at 78.

5.  To finance the purchase of the Leda, Anchor Charters signed a promissory note to Regions Bank in the amount of $326,525.15. Tr. at 126-29. As part of Anchor Charters's financing plan with Regions Bank, Anchor Charters was required to enter into a $150,000.00 security agreement with a 41 foot Tartan vessel owned by Myron and Barbara Bailey as collateral. Id.

6.  In light of Ed Rowe & Associates' survey and the requirement of cross-collateralization by Regions Bank, the Court finds that the Leda had a fair market value of $360,000.00 at the time that Anchor Charters purchased the Leda on November 21, 2000.

7.  Anchor Charters claims to have infused approximately $243,350.00 into the Leda. Of

this amount, however: a.) $20,120.00 of this amount was for the payment of Florida state sales tax; and b.) $98,520.00 of this amount was for time "billed" by Myron Bailey for his own personal labor. Tr. at 600-02. Anchor Charters never paid Myron Bailey for the work completed. Accordingly, when the sales tax and Myron Bailey's labor hours are deducted, Anchor Charters's claim of capital improvements to the Leda is properly $124,710.00. Of this amount, an unknown sum represents other charges for labor expended by Myron Bailey. Id. Thus, the Court finds that the value of improvements infused by Anchor Charters into the Leda is less than $124,710.00.

8.  Defendant OLD PARK INVESTMENTS d/b/a HARBORTOWN ("Harbortown") operates a marina located at 1936 Harbortown Drive, Fort Pierce, Florida. The marina was constructed in 1985 and consists of nine (9) docks starting from "A" dock to the north and ending with "I" dock to the south. Tr. at 700-03. Harbortown is a full-service marina providing wet slip dockage as well as dry dock storage "on the hard." Tr. at 705-06.

9.  Hurricanes Frances and Jeanne were the first hurricanes to materially affect Harbortown. Tr. at 745.

10. Harbortown was aware of the need to monitor the condition of the pilings used to tie off and secure vessels, particularly for the effects of the marine organism known as shipworm (*teredo navalis*). Tr. at 707-08. Shipworm can cause hourglassing (a reduction in the surface area of the midsection of a piling) that affects the structural integrity of the piling. Harbortown had a maintenance plan in place whereby its employee, Bob Beakley, would periodically (every 2-3 months) inspect the pilings at low tide and would mark deteriorated pilings with an orange circle. The orange circle indicated to Summerlin

Seven Seas, Harbortown's contractor, that the piling needed replacement. Tr. at 711. Bob Beakley had inspected the pilings at slip I-19 within a few months before Hurricane Frances and found them to be in good condition. Id., see also Def. Ex. 25 at 45-47

11. On or about August 31, 2004, Anchor Charters brought the Leda from the Bahamas to Harbortown in order to seek refuge from Hurricane Frances.

12. As Anchor Charters had been a previous customer of Harbortown, Harbortown allowed Anchor Charters to dock the Leda at the marina during a time when other marinas were turning vessels away. Tr. at 193-94, 228 & 771.

13. Harbortown directed Anchor Charters to moor the Leda in slip I-19, the same slip at which the Leda had previously been moored for several months prior to the Leda's departure for the Bahams. Tr. at 142, 194-95.

14. Myron Bailey performed all necessary pre-hurricane mooring arrangements of the Leda and no employee or representative of Harbortown assisted him. Tr. at 145-46. An employee of Harbortown remarked that Myron Bailey's lines "looked good" but made no guarantees, warranties, or assurances to Myron Bailey or Anchor Charters regarding the safety of the Leda as moored in slip I-19. Tr. at 194-96. The lines used to tie the Leda to the pilings were approximately one (1) inch in diameter, slightly larger than the average rope used to secure vessels.

15. At no time prior to Hurricane Frances did Anchor Charters observe any problems with the structural integrity of the pilings at slip I-19. Tr. at 143.

16. During the late hours of September 4, 2004, and the early morning hours of September 5, 2004, Hurricane Frances made landfall in the Fort Pierce, Florida area, including the location of Harbortown. The sustained wind speed at Harbortown remained near or

4

above hurricane force beginning at 11:00 p.m. on September 4, 2005. The maximum one (1) minute average speed of 81 miles per hour (m.p.h.) occurred around 12:00 a.m. September 5, 2005, with the wind coming from the northeast. The peak three (3) second gust of about 108 m.p.h. occurred at 12:01 a.m. and came from the north/northeast.

17. During Hurricane Frances, the port aft piling to which the Leda was moored broke, allowing the Leda to move freely in slip I-19 and causing damages to the vessel. Tr. at 347-48.

18. Plaintiffs' theory in this action is that the port aft piling broke because it had deteriorated due to shipworm.

19. Plaintiffs offered the expert testimony of Robert Schofield ("Schofield"), a naval architect and engineer, on the issue of causation of the piling's breaking.

20. Schofield testified that it was his expert opinion that since all of the mooring lines held fast during Hurricane Frances and based upon calculations he performed, that the port aft piling must have deteriorated before the storm, causing it to break. Tr. at 349 et seq.; Tr. at 419-30. Schofield also admitted, however, that his calculations were based upon the breaking point of a standard three-quarter (3/4) inch mooring line, not the approximately one (1) inch mooring line actually used by Myron Bailey when securing the Leda. Id.

21. Schofield, for the purposes of his calculations, also assumed that the port aft piling had an eight (8) foot "moment" arm (the distance between where the piling is buried in the spoil to the point where the mooring line is tied to the piling). Tr. at 419-30. Schofield also testified the closer to the top of a piling that a mooring line is secured, the greater the moment arm and, in turn, the less pulling force required to break the piling because of a

"cantilever" effect. Tr. at 419-31. Schofield also conceded that an outer piling[3] next to slip I-19 possessed a nine (9) foot moment arm and that a nine foot moment arm would have also affected his calculations. Id.

22. Anchor Charters and its co-plaintiff, Northern Insurance, took various pictures of the Leda while she was in the water after Hurricane Frances. None of these pictures is of the port aft piling at issue in this case. Further, the piling was neither identified nor preserved after Hurricane Frances.

23. Myron Bailey testified that when he inspected the Leda after Hurricane Frances, he saw a broken piling still tied to the port aft cleat of the Leda and that the piling appeared to have broken off at the penetration point, where the piling enters the spoil. Tr. at 153-54.

24. Based on the evidence presented and the testimony at trial, Plaintiff has failed to show that it is more likely than not that the port aft piling broke due to deterioration by shipworm or other factor.

25. Schofield also offered the opinion that Harbortown improperly instructed Anchor Charters to berth the Leda in slip I-19 because it was the most exposed to an easterly wind, which he testified was the direction of the strongest winds during Hurricane Frances. Tr. at 349-53. The report by Dr. Lee Branscome that Schofield relied upon, however, states that the strongest winds came from the north-northeast. Def. Ex. 26; Tr. at 343-44. Schofield also testified that had the Leda been placed at another dock in the marina, she would have survived the storm with significantly less damage. Tr. at 373.

26. Rick Lohr ("Lohr"), operations manager for Harbortown, testified however that immediately after Hurricane Frances, the marina was "a total disaster." Tr. at 718. Lohr

---

[3] The port aft piling at issue in this case was an outer piling.

stated that virtually every part of the marina and each one of its docks sustained damage. Tr. at 719. A boat sank at A-Dock, B-Dock was virtually eliminated, a boat was moved almost into the parking lot south of B-Dock, C-Dock had a lot of damage and many boats berthed there were damaged, a boat sank at D-Dock, boats berthed at E-dock were damaged, F-Dock was damaged and a boat sank there with three other sailboats on top of it, many boats were moved around or damaged on G-Dock, and boats were moved around on H-Dock. Tr. at 719-24.

27. Plaintiffs have taken issue with Harbortown's attempt to impose a personal guaranty (for damages done to Harbortown property) on boat owners before the owners were allowed to remove their vessels. The Court finds, however, that based upon evidence adduced by the Court's examination of Harbortown's representative, Rick Lohr, the earliest that severely damaged boats were able to be removed by Harbortown was 10-12 days after Hurricane Frances. Tr. at 777-78. Thus, the Court finds that Plaintiffs' complaints regarding the guaranty and/or inability to remove the Leda are moot.

28. The Court finds that the meteorological conditions and evidence of damage to other docks and boats throughout the marina demonstrate that the Leda could have sustained damage regardless of where it was berthed and Harbortown did not know, nor should it have known, that the Leda would sustain damage if it berthed at slip I-19.

29. At all material times, the Leda was insured with the Northern Insurance Company of New York ("Northern"). Anchor Charters and the Leda were insured under Northern's marine insurance policy for an agreed value of $360,000.00 in the event of a total loss of the vessel.

30. On September 6, 2004, Anchor Charters gave notice to Northern of the loss sustained by

the Leda due to Hurricane Frances. Tr. at 261. On September 8, 2004, Collin Wheeler ("Wheeler"), Northern's adjuster for the subject loss, traveled to Harbortown to inspect the Leda. Tr. at 231-33. On September 14, 2004, Wheeler declared the Leda a constructive total loss. Tr. at 290-91.

31. Wheeler testified that Northern's decision to declare the Leda a constructive total loss was based solely on the damages that the Leda sustained as a result of Hurricane Frances. Tr. at 290-91. On September 14, 2004, Northern contacted Certified Sales, Inc., a salvage company, to auction the Leda once she was declared a constructive total loss.

32. On September 17, 2004, Anchor Charters then provided a U.S. Coast Guard Bill of Sale, transferring 100% ownership interest in the Leda to Certified Sales, Inc. Pl. Ex. 19.

33. Subsequently, on October 4, 2004, Northern issued Anchor Charters a check for $9,315.63 for personal effects on board the Leda at the time of the loss. Pl. Ex. 20. Then, on October 12, 2004, Northern issued a check to Regions Bank in the amount of $201,066.36 to satisfy Regions Bank's lien on the Leda (that was cross-collateralized with the 41 foot Tartan). Pl. Ex. 23. Finally, on October 19, 2004, Northern issued a check to Anchor Charters for $148,133.64 for the balance of the claim. Pl. Ex. 23. The total amount paid by Northern was $358,515.63.

34. In connection with the sale of the salvage of the Leda by Certified Sales, Inc., Northern received $279,672.16. Pl. Ex. 15. This amount reflects a high bid of $315,000.00 less necessary auction and salvage expenses. Id.

35. On September 23, 2004, after Hurricane Frances, but prior to Hurricane Jeanne, the Leda was removed by Beyel Brothers from its position in the area of slip I-19 and placed "on the hard" in Harbortown's dry storage area. Tr. at 739. The Leda was placed on jack

stands that were allegedly either not chained together or not properly secured. As a result, when Hurricane Jeanne struck Harbortown on September 28, 2004, the Leda was allegedly damaged further when she was dislodged from her stands. Tr. at 202-03, 331, 496-98. Based upon the previous declaration by Wheeler, however, that the Leda was a constructive total loss on September 14, 2004, the Court finds that even if the Leda suffered some additional damage as a result of alleged improper storage, no cognizable claim can arise.

## II. CONCLUSIONS OF LAW

1. The Court has admiralty subject matter jurisdiction pursuant to 28 U.S.C. § 1333. Two distinct tests have been developed for determining the reach of the Court's admiralty jurisdiction: a subject matter test for contract claims and a locality "plus" test for tort claims. See Victory Carriers, Inc. v. Law, 404 U.S. 202, 205-06 (1971). Jurisdiction over a tort claim in admiralty exists when the "navigable waters" locality test, supplemented by the "significant relationship to traditional maritime activity" nexus test, is met. Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, 409 U.S. 249, 258-60 (1972).

2. A party seeking to invoke federal admiralty jurisdiction must satisfy both the locality and the nexus test. See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995). "A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether 'the general character' of the 'activity giving rise to the incident' shows a

substantial relationship to traditional maritime activity." Id. (internal quotations and citations omitted). The Court concludes that both the situs (locality) and the nexus requirements have been met and that the Court has federal admiralty jurisdiction.

A. **Count I - Breach of the Duty of a Wharfinger**

3. Harbortown was, at all times material to this action, a wharfinger. A wharfinger owes a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. See Trade Banner Line, Inc. v. Caribbean S. S. Co., S.A., 521 F.2d 229, 230 (5th Cir. 1975).[4] It is well settled, however, that a wharfinger is "not the guarantor of the safety of a ship coming to his wharf." Id. The wharfinger's duty includes the responsibility to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner. Id.

4. To establish a wharfinger's liability for the sinking of a vessel at the wharf, the vessel owner must sustain a case of negligence against the wharfinger. See, e.g., United States v. Mowbray's Floating Equipment Exchange, Inc., 601 F.2d 645 (2d Cir. 1979). Further, "[i]n ruling upon whether a defendant's blameworthy act was sufficiently related to the resulting harm to warrant imposing liability for that harm on the defendant, courts sitting in admiralty may draw guidance from, inter alia, the extensive body of state law applying proximate causation requirements and from treatises and other scholarly sources." Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 839 (1996).

---

[4] The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit rendered before October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

5. As this Court sits in the state of Florida and all relevant events occurred in the state of Florida, the Court will look to Florida state law to determine the applicable negligence standard.

6. "To sustain any cause of action predicated on negligence, it is fundamental that the plaintiff must establish:

   (1) Existence of a duty on the part of the defendant to protect the plaintiff from the injury or damage of which he complains;

   (2) Failure of the defendant to perform the duty [a breach of that duty]; and

   (3) Injury or damage to the plaintiff proximately caused by such failure [or breach]."

   Lake Parker Mall, Inc. v. Carson, 327 So. 2d 121, 123 (Fla. Ct. App. 1976).

7. With respect to the last element, proximate causation, Florida courts have adopted the "more likely than not" standard and require proof that the alleged negligence probably caused plaintiff's injury. See, e.g., Gooding v. University Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984). "On the issue of the fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." Id. (citation omitted).

8. Plaintiffs have not demonstrated that it is more likely than not that any alleged negligence of Defendant was the proximate cause of the damage to the Leda. Plaintiffs' expert witness's (Schofield) testimony regarding causation revealed that he did not utilize the

11

      correct data when determining that the port aft piling's fracture was likely due to shipworm. Further, the fact that Hurricane Frances brought strong winds exceeding 105 m.p.h., other pilings throughout Harbortown broke due to the force of the storm, and the fact that Myron Bailey's testimony was that the port aft piling appeared to have broken at the mudline where the piling enters the spoil all show that it is not "more likely than not" that shipworm caused the port aft piling to break.

9. Based upon the above findings of fact and applying them to the above standard of law, the Court concludes as a matter of law that Plaintiffs have not sustained their burden of proof as it pertains to the proximate causation element of negligence which is necessary to prevail on a claim of breach of duty of a wharfinger.

**B.** **Count II - Misrepresentation**

10. As misrepresentation is, like the breach of a wharfinger's duty, a state law claim, the Court looks to Florida state law to determine its elements.

11. "The elements necessary to establish a cause of action for fraudulent misrepresentation are: (1) a false statement or misrepresentation of a material fact; (2) the representor's knowledge at the time the misrepresentation is made that such statement is false; (3) such misrepresentation was intended to induce another to act in reliance thereon; (4) action in justifiable reliance on the representation; and (5) resulting damage or injury to the party so acting." Thor Bear, Inc. v. Crocker Mizner Park, Inc., 648 So. 2d 168, 172 (Fla. Ct. App. 1994) (citations omitted).

12. Here, Harbortown made no guarantees or assurances to Plaintiffs Anchor Charters, Myron Bailey, Barbara Bailey or the Leda, nor did Harbortown know at the time that any representations it made at the time the Leda berthed were false. Harbortown had never

experienced a hurricane, did not affix the mooring lines from the Leda to the pilings nor did it know of any defect in the port aft piling (or any piling for that matter) that it failed to disclose to Plaintiffs.

13. Based upon the above findings of fact and applying them to the legal standard enumerated above, the Court concludes as a matter of law that Plaintiffs have not proved their entitlement to relief under Count II based upon Defendant's alleged misrepresentation.

C. **Counts III-V: Negligent Storage, Trespass & Wrongful Lien**

14. The evidence adduced at trial demonstrated that Wheeler, Plaintiff Northern's insurance adjuster, declared the Leda a constructive total loss due to the damage it sustained as a result on Hurricane Frances on September 14, 2004. Any additional damage that may or may not have occurred due to Hurricane Ivan, Hurricane Jeanne, any other Act of God, or any alleged malfeasance on the part of Harbortown, according to Wheeler's testimony, did not affect this determination.

15. The Court has found that Northern declared the Leda a constructive total loss on September 14, 2004 and Anchor Charters executed a U.S. Coast Guard Bill of Sale on September 17, 2004, transferring 100% of its interest in the Leda. Further, Northern proceeded to issue checks to the lienholder on the Leda, to Anchor Charters for the personal effects damaged by Hurricane Frances, and to Anchor Charters for the balance of the hull policy less the lienholder payoff amount. Finally, Northern contracted Certified Salvage, Inc. to auction the Leda and received payment therefrom.

16. Based upon these findings of fact, particularly the determination by Wheeler and the U.S. Coast Guard Bill of Sale signed by an authorized representative of Anchor Charters, the Court concludes as a matter of law that Plaintiffs cannot sustain any claim under a theory

of Negligent Storage, Trespass or Wrongful Lien for the actions of Harbortown after September 17, 2004. The Leda was, at that time, a constructive total loss and Anchor Charters had transferred all interest in the Leda. Thus, recovery for damages under each of these theories is a legal impossibility.

**D.     Defendant's Affirmative Defense of "Act of God" and/or <u>Vis Major</u>**

17.    Defendant claims that Hurricane Frances was an "Act of God" and/or a <u>vis major</u>. <u>Fischer v. S/Y Neraida</u>, 2005 WL 3991039 (Bkrtcy. S.D. Fla., Dec. 16, 2005) (slip copy); see also <u>Skandia Ins. Co., Ltd. v. Star Shipping AS</u>, 173 F. Supp. 2d 1228, 1239-45 (S.D. Ala. 2001) (explaining legal standard for "Act of God" defense to liability).

18.    As the Court has concluded that the facts prevent Plaintiffs' from sustaining its legal burden of proving Defendant's liability under any of its five (5) theories, there is no need for the Court to address Defendant's affirmative defense.

### III. CONCLUSION

Hurricane Frances wreaked considerable havoc on Florida's eastern coast, including the Ft. Pierce area. Unfortunately, the Leda was one of the vessels to feel its full fury and was damaged to the point of being a constructive total loss. In this case, each of the parties acted in a responsible manner. First, Anchor Charters sought safe harbor for the Leda from the approaching tempest. Second, Harbortown allowed the Leda to berth at its marina and for Anchor Charters to secure the vessel as best Anchor Charters could. Third, upon the damage done to the Leda by Hurricane Frances, Northern sought to quickly satisfy its responsibilities as an insurer and maximize its claimants' recovery. Fourth, Northern was able to recoup a portion of its costs through salvaging the vessel.

For the reasons stated above and pursuant to the Court's Findings of Fact and

Conclusions of Law, it is

ORDERED AND ADJUDGED that Plaintiffs' Complaint, originally styled as a Counterclaim (DE #14) is DISMISSED WITH PREJUDICE. Pursuant to Fed. R. Civ. P. 58, the Court shall issue a separate Final Judgment. It is further

ORDERED AND ADJUDGED that the Clerk of Court is directed to CLOSE this case. All pending motions not yet ruled upon are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Ft. Pierce, Florida, this 14th day of December, 2006.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc: All Counsel of Record
U.S. Magistrate Judge Frank J. Lynch